## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **MICHAEL CURTIS REYNOLDS,**<br>**#10671-023,** | |
| **Plaintiff,** | **Case No. 21-cv-00345-SPM** |
| **v.** | |
| **FAISAL VAKIL AHMED**, *et al.,* | |
| **Defendants.** | |

## MEMORANDUM AND ORDER

**MCGLYNN, District Judge:**

This matter is before the Court on three motions for preliminary injunctions (Doc. 2, 54, 58) [1] filed by Plaintiff Reynolds, as well as his motions for leave to proceed *in forma pauperis* (Doc. 37, 55). For the following reasons, the motions are denied.

### BACKGROUND

Plaintiff Michael Reynolds, an inmate with the Federal Bureau of Prisons who is currently incarcerated at the Federal Correctional Institution located in Greenville, Illinois (FCI-Greenville), commenced this civil rights action by filing a Complaint alleging violations of his constitutional rights by persons acting under the color of federal authority. *See Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971) (allowing "suits against federal employees for violation of constitutional rights"). Reynolds claims that Defendants have failed to implement proper COVID-19 safety protocols at FCI-Greenville resulting in the infection of hundreds of inmates with the virus. (Doc. 2, p. 4). Defendant Dr. Ahmed allowed an inmate known to be infected with COVID-

---

[1] Two of these motions were filed as "mandamus motion for medical relief" and "mandamus motion for medical necessity." (Docs. 54, 58). The Court will treat these motions as requests for injunctive relief.

19 to enter FCI-Greenville. (*Id.* at p. 2). The inmate was placed in Unit 3A, where Reynolds was housed, without first being placed in quarantine for fourteen days or receiving negative results from a COVID test. (*Id.*). Because this inmate was allowed to enter the facility, a COVID-19 outbreak occurred. (Doc. 1, p. 12). Dr. Ahmed also did not implement screening procedures for staff. (Doc. 2, p. 2). Three staff members infected with COVID-19 worked in Reynolds's housing unit, further exposing him to the virus. (Doc. 2, p. 2; Doc. 1, p. 12). Defendants Warden Williams and Assistant Warden Santiago knew that Dr. Ahmed did not maintain proper quarantine procedures. (Doc. 1, p. 13). Additionally, Warden Williams knew of staff refusing to wear masks, travelling to and from quarantine blocks, and working in quarantined areas and then working in a general population block during the COVID-19 outbreak. As a result of inadequate safety protocols, Reynolds contracted COVID-19 in October 2020. (Doc. 2, p. 2; Doc. 54, p. 1).

Reynolds further asserts that during the pandemic, Dr. Ahmed has halted all medical treatment. (Doc. 1, pp. 5, 7, 13). Reynolds continues to experience lingering COVID symptoms, such as cough, chest pains, fatigue, muscle and joint pain, and nose bleeds. (Doc. 1, p.12; Doc. 2, p. 12). He submitted sick calls for these issues and his hernia pain, but Dr. Ahmed ignored his requests for treatment.

On April 19, 2021, the Court conducted a preliminary review of the Complaint pursuant to 28 U.S.C. § 1915A. Reynolds was allowed to proceed with the following claims:

**Count 1:**   Eighth Amendment claim of deliberate indifference to serious medical conditions against Dr. Ahmed for denying Reynolds medical treatment for his hernia pain, COVID-19 symptoms, and heart condition.

**Count 2:**   Eighth Amendment claim of unconstitutional conditions of confinement against Dr. Ahmed, Williams, and Santiago for failing to enforce and implement necessary safety protocols to protect Reynolds from exposure to COVID-19.

(Doc. 7, p. 4-5). The Court directed Defendants to respond to the motion for preliminary injunction.

In the screening order, the Court also discussed Reynolds filing fee status. Reynolds had not paid the $402 filing fee or filed a motion to proceed *in forma pauperis* ("IFP"). (Doc. 7, p. 2). Because Reynolds has accumulated at least three "strikes" for purposes of Section 1915(g),[2] he is prohibited from filing a lawsuit without full prepayment of the filing fee, unless he can show that he faces imminent danger of serious physical injury. *See* 28 U.S.C. § 1915(g).[3] In a document titled "Motion for Changes to Filing," Reynolds asserts that the risk of becoming reinfected with COVID-19 poses an imminent danger due to his underlying medical conditions. (Doc. 6). At the time, Reynolds had not filed an IFP motion and supporting financial information, thus, the Court did not consider his claims of imminent danger. Reynolds was directed to pay the filing fee or file a motion for leave to proceed IFP by April 30, 2021. (Doc. 7). He was informed that his claims of imminent danger would be considered once he filed an IFP motion.

On June 17, 2021, granting Defendant Williams motion, the Court stayed all litigation activities and deadlines, other than those associated with the pending motion for preliminary injunction and the determination of Reynolds's filing fee status. (Doc. 33). Reynolds was also given additional time to file an IFP motion, and the new deadline was set for June 28, 2021. On June 17, 2021, Reynolds filed a motion for leave to proceed *in forma pauperis* and on July 1, 2021, the Court received his trust fund account information. (Doc. 37, 47, 53). Reynolds then filed two motions for mandamus regarding ongoing issues with his medical care, which the Court construed as additional requests for preliminary injunctive relief (Docs. 54, 58, 60), and another IFP motion

---

[2] *See Reynolds v. Lackawanna Cty. Prison,* No. 06-cv-01733-JFM-JVW, Doc. 10 (M.D. Pa. July 7, 2006) (dismissing case as frivolous); *Reynolds v. Gurganus,* No. 06-cv-01753-JFM-JVW, Doc. 7 (M.D. Pa. Sept. 11, 2006) (dismissing case as frivolous); *Reynolds v. Kosik,* No. 06-cv-02466-JFM-JVW, Doc. 10 (M.D. Pa. Jan. 18, 2007) (dismissing case as frivolous).

[3] Pursuant to Section 1915(g), a prisoner is prohibited from bringing a civil action IFP, "if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury." 28 U.S.C. § 1915(g).

(Doc. 55).

Defendants filed responses in opposition to the preliminary injunction motions arguing that Reynolds had failed to demonstrate the necessary elements required for preliminary injunctive relief. (Docs. 21, 52, 74). Because Defendants challenged Reynolds's claims for preliminary injunctive relief, which are the same factual allegations supporting his assertion of imminent danger, the Court set an evidentiary hearing on the motions for preliminary injunction and the IFP motions. *See Taylor v. Watkins,* 623 F. 3d 483, 484 (7th Cir. 2010) (a hearing is a proper way to resolve a disputed claims of imminent danger). *See also Talley v. Lee,* No. 15-cv-1032-NJR-DGW, 2016 WL 5118651, at *3 (S.D. Ill. Sept. 23, 2016) (noting that plaintiff's IFP motion and request for a preliminary injunction were "initially supported by the exact same allegations and therefore inseparably linked"). The Court held a hearing on August 26, 2021. The Court heard testimony from Plaintiff Reynolds, Health Service Administrator Susan Brazzell, and Physician Assistant Kimberly Schneider.

## ARGUMENTS

Reynolds claims that proper safety COVID-19 protocols continue to not to be followed by staff at FCI-Greenville, putting him in imminent danger of further exposure and reinfection. (Doc. 2, p. 2; Doc. 68, p. 7). Reynolds is 63 years old, a Native American Indian, and has a family history of congestive heart failure. Because of his race, age, and underlying medical conditions, he could suffer serious medical complications if he contracts the virus a second time. (Doc. 6, p. 2). Reynolds also asserts that he is unable to take the vaccine. (Doc. 6, p. 2). He is allergic to several other vaccinations, and Dr. Ahmed has not provided him information on the ingredients of the COVID-19 vaccine and has not confirmed that the vaccine is safe for Reynolds to take. (*Id.*; Doc. 94, p. 5). Reynolds argues that he is at risk of imminent harm of serious illness or death from COVID-19 while he remains at FCI-Greenville. (Doc. 1, p. 12).

In his subsequent motions for injunctive relief, Reynolds also claims that he is not being provided adequate medical treatment for the following conditions: scarring the lungs, nasal scarring, unspecified dental and eye issues, prostate and hernia issues, a heart condition, and gonorrhea. (Docs. 54, 58). He seeks the Court to order x-rays, blood tests, MRIs, and exams to be completed within two weeks.

Defendants argue that Reynolds has not shown he will suffer irreparable harm due to inadequate COVID-19 safety protocols if his request for injunctive relief is denied. (Doc. 21, p. 4). At the time of filing the response, on May 17, 2021, FCI-Greenville had no active COVID cases. (*Id.*). Accordingly, there is no evidence to support a claim that he is at any risk of contracting COVID-19, now or in the future. Furthermore, the vaccine is available to inmates, but Reynolds refused vaccination on April 1, 2021. (Doc. 21-1, p. 12). Currently, over 65% of all staff and inmates are vaccinated. Although Reynolds previously contracted COVID-19, his fear that he might contract it again is unsupported by any current condition at the facility.

Along with their responses, Defendants have filed a declaration by Assistant Warden Jeffrey Cheeks, who assists with the coordination of FCI-Greenville's COVID-19 response. (Doc. 21-1, p. 1-13). In the declaration, Cheeks details the COVID-19 safety measures and policies followed at FCI-Greenville. According to Cheeks, FCI-Greenville has fully implemented the Federal Bureau of Prisons' multi-phase Action Plan, developed for mitigating the spread of COVID-19. Each phase of the Action Plan was systematically implemented beginning in January 2020 and contains various COVID management measures to be followed at the facilities. The Action Plan addresses areas such as staff and inmate education on COVID-19 symptoms, suspensions on visits, screening and testing requirements for staff and inmates, designated areas for quarantining and isolation, decreased movement of inmates within and outside of the facility, increased cleaning and sanitation measures, social distancing requirements, and requirements

Page 5 of 19

regarding face coverings and the use of other required personal protective equipment.

Cheeks states that FCI-Greenville experienced an outbreak of COVID-19, particularly in the fall of 2020. In response, staff continued to follow the guidelines as delineated in the Action Plan and also implemented temporary lockdowns, prioritization of testing and medical treatment for symptomatic inmates, and extensive quarantine management. As a result of the mitigation efforts, the administration was able to effectively limit and reduce the spread of the virus, and FCI-Greenville has not experienced any COVID-19 related deaths. Cheeks also asserts that FCI-Greenville continues to maintain social distancing, sanitation, testing, and other preventative measures with respect to the pandemic, as periodically updated by the BOP. FCI-Greenville has adopted and continue to implement COVID-related measures. Thus, Reynolds will not suffer irreparable harm without an injunction.

Furthermore, Defendants argue that Reynolds is not entitled to injunctive relief concerning his claims of lack of treatment for various medical conditions. (Doc. 74). They argue he has failed to establish that he suffers from serious medical condition in the first place, and thus, he cannot establish any likelihood of success on his Eighth Amendment deliberate indifference claim. Reynolds asserts that he suffers from several medical conditions, but other than broad assertions, he provides no evidence or medical justification that further treatment is required. In support of their position, Defendants have submitted the declaration of Dr. Ahmed, the Clinical Director of FCI-Greenville, in which he summarizes the medical records associated with the care of the conditions complained of by Reynolds. (*See* Doc. 74-1). Defendants argue that the medical record makes clear that Reynolds overstates the severity and urgency of each of the issues he identifies. He has received evaluation, testing, and treatment for each for the three primary medical complaints he has identified — cardiovascular disease, prostate/abdominal issues, and pulmonary complaints. The medical records do not confirm any significant diagnosis that would be obviously

Page 6 of 19

serious, and certainly not to the level of requiring immediate or urgent intervention. Rather, Reynolds is being monitored and evaluated "based upon what may be reasonable concern about conditions that could be potentially serious if he is confirmed to have them," but none of these medical issues appear to be objectively serious at this time.

Even if the conditions are objectively serious, Defendants argue that the medical records demonstrate that the health care providers at FCI-Greenville are monitoring his conditions, have set out a treatment plan, and are prescribing medication to help his various ailments. When Reynolds has reported issues to Health Services, he has been evaluated and treated. Although Reynolds may desire more frequent testing and evaluation or disagree with treatment decisions, there is no indication that his medical providers have ignored his concerns. Thus, he cannot demonstrate that Defendants acted with deliberate indifference.

Finally, because the medical records indicate that Reynolds is being seen on a periodic basis and there is no medical evidence to suggest an urgent need, Reynolds will not suffer irreparable harm if the Court does not issue an injunction. He has failed to show that he will suffer further harm under the current treatment plan, and the motions for preliminary injunctions should be denied.

ANALYSIS

## I. Motions for a Preliminary Injunction

### a. Legal Standard

A preliminary injunction is an "extraordinary and drastic remedy" for which there must be a "clear showing" that a plaintiff is entitled to relief. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoting 11A CHARLES ALAN WRIGHT, ARTHUR R MILLER, & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2948 (5th ed. 1995)). The purpose of such an injunction is "to minimize the hardship to the parties pending the ultimate resolution of the lawsuit." *Faheem-El v.*

*Klincar*, 841 F.2d 712, 717 (7th Cir. 1988). A plaintiff has the burden of demonstrating:

- a reasonable likelihood of success on the merits;
- no adequate remedy at law; and
- irreparable harm absent the injunction.

*Planned Parenthood v. Comm'r of Ind. State Dep't Health*, 699 F.3d 962, 972 (7th Cir. 2012).

Once a plaintiff has met this burden, the Court must weigh "the balance of harm to the parties if the injunction is granted or denied and also evaluate the effect of an injunction on the public interest." *Id.; Korte v. Sebelius*, 735 F.3d 654, 665 (7th Cir. 2013). "This equitable balancing proceeds on a sliding-scale analysis; the greater the likelihood of success of the merits, the less heavily the balance of harms must tip in the moving party's favor." *Korte,* 735 F.3d at 665. In addition, the Prison Litigation Reform Act provides that a preliminary injunction must be "narrowly drawn, extend no further than necessary to correct the harm . . . ," and "be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2). Finally, pursuant to Federal Rule of Civil Procedure 65(d)(2), a preliminary injunction would bind only the parties, their officers or agents, or persons in active concert with the parties or their agents.

### b. COVID-19 Procedures at FCI-Greenville

In Reynolds's initial motion for preliminary injunction, he asks for injunctive relief in the form of enjoining Dr. Ahmed from medical employment in the State of Illinois. (Doc. 2, p. 3). He claims that Dr. Ahmed failed to implement proper quarantine proceeds that resulted in an outbreak of COVID-19. Specifically, as someone with an increased risk of getting sick and dying from COVID-19, Reynolds was not properly quarantined to prevent exposure from asymptomatic staff and inmates. (Doc. 68, p. 1). Only newly arriving inmates were screened for COVID-19, and inmates already housed at FCI-Greenville were not screened or tested until October 2020. (*Id.* at p. 2). If procedures remain unchanged, Reynolds claims he will again be infected with COVID-19

Page 8 of 19

and could suffer serious medical complications.

Reynolds has failed to demonstrate that he will suffer irreparable harm due to inadequate COVID-19 procedures absent a Court ordered injunction. In his filings, he provides information on what conduct he believes led to an outbreak in the fall of 2020. He asserts that he is in imminent danger "based upon the past performance of Ahmed and staff at FCI Greenville, and Petitioner will again be at risk of reinfection by COVID…" (Doc. 68, p. 7). He further contends that he has "proven his imminent risk of further harm. His harm has already occurred in Oct. 2020." (*Id.* at p. 10). However, a "possibility" of harm based on past conduct occurring prior to the filing of this lawsuit is insufficient to demonstrate that "irreparable injury is *likely*" without Court interference. *Winter v. Nat'l Res. Def. Council, Inc.,* 555 U.S. 7, 22 (2008). At this stage, his fear of additional harm resulting from further exposure to the COVID-19 virus is only speculative. *See Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 22 (2008) ("[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy"); *Mich. v. U.S. Army Corps of Eng'r,* 667 F. 3d 765, 788 (7th Cir. 2011) ("there must be more than a mere possibility that the harm will come to pass"). As the pandemic continues, Reynolds's likelihood of becoming reinfected has significantly decreased. He has already contracted and recovered from COVID-19, and while ongoing studies continue, at this point in time "[c]ases of reinfection with COVID-19 have been reported, but remain rare." CTRS. FOR DISEASE CONTROL, REINFECTION (Aug. 6, 2021) https://www.cdc.gov/coronavirus/2019-ncov/your-health/reinfection.html (last visited Aug. 30, 2021).[4]

---

[4] The Court has the authority "to take judicial notice of government websites." *Picket v. Sheridan Health Care Center,* 664 F. 3d 632, 648 (7th Cir. 2011) (citing FED. R. EVID. 201(c)(1)). *See also Bodnar v. Lake Cty. Jail,* No. 20-cv-157-PPS-APR, 2020 WL 1940742, at * 2 (N.D. Ind. Apr. 22, 2020) (taking judicial notice of the CDC's guidelines for managing COVID-19 in the correctional setting when screening a complaint pursuant to 28 U.S.C. § 1915A).

Furthermore, federal district courts continue to acknowledge "that the deployment of the vaccine by the [Bureau of Prisons] significantly mitigates the assessment of risk." *Justich, v. Carr,* No. 20-cv-1575-JPS, 2021 WL 3711101, at *4 (E.D. Wisc. Aug. 20, 2021) (quoting *United States v. Sims,* No. 90-80492, 2021 WL 872218, at *3 (E.D. Mich. Mar. 9, 2021)). As of May 17, 2021, approximately 68% of staff and 65% of inmates at FCI-Greenville had been vaccinated. (Doc. 21-1, p.12). Additionally, according to the Federal Bureau of Prisons website there are currently zero confirmed inmate active cases and only two staff active cases at FCI-Greenville. FED. BUREAU OF PRISONS, COVID-19 CASES, https://www.bop.gov/coronavirus/ (last visited August 30, 2021).

At the hearing, Reynolds testified that he was offered and refused the Pfizer vaccine because he might be allergic to the ingredients. He stated that the medical records documenting his allergies to other vaccines were in the possession of the United States Army and were destroyed in a fire in the 1980's. Reynolds confirmed that there is no medical documentation available to medical providers at FCI-Greenville confirming that the vaccine is medically contraindicated for him. Furthermore, he has not provided any details regarding his allergies, such as the types of vaccines or ingredients to which he is allergic or symptoms he has or could experience. The Court recognizes that the Delta variant "might cause more severe illness than previous strains in unvaccinated people," REINFECTION (Aug. 6, 2021), and that Reynolds has the right to refuse the vaccine. The federal courts, however, do not have to accept "a prisoner's self-diagnosed skepticism about the COVID-19 vaccines as an adequate explanation for remaining unvaccinated, when the responsible agencies all deem vaccination safe and effective." *United States v. Broadfield,* 5 F. 4th 801, 803 (7th Cir. 2021). The Court will not issue a preliminary injunction, an extraordinary and drastic remedy, when Reynolds has not availed himself of the ability to receive a vaccine, a "relief far more effective than a judicial order." *Id.* (discussing the availability of compassionate release under 18 U.S.C. § 3582(c)(1)(A)). Because Reynolds has failed to show he will suffer irreparable

harm as to inadequate COVID-19 safety procedures at FCI-Greenville, the motion for preliminary injunction (Doc. 2) is denied.

### C. Inadequate Medical Treatment

The Court also finds that Reynolds has failed to demonstrate all of the factors necessary for obtaining a preliminary injunction, as to his claims of inadequate medical treatment regarding cardiovascular disease, post COVID conditions, abdominal pain, and dental and eye care needs. Notably, he has not shown that he is likely to succeed on the merits of his Eighth Amendment claim that Dr. Ahmed responded to his serious medical needs with deliberate indifference, which requires a "showing as something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Rosario v. Brawn,* 670 F. 3d 816, 822 (7th Cir. 2012) (internal citations and quotations omitted). "It is not enough that the plaintiff simply believes the treatment was ineffective or disagrees with the doctor's chosen course of treatment." *Thomas v. Martija,* 991 F. 3d 763, 772 (7th Cir. 2021). The treatment plan "must deviate so substantially from accepted professional judgment that no reasonable physician would reach the same judgment." *Id.*

Since notifying medical professionals that he has a family history of sudden cardiac death, Reynolds has had the following tests and evaluations: cardiac assessments via auscultation, preventative lab tests for any indications of cardiovascular disease, an EKG, and an echocardiogram. These evaluations revealed that Reynolds's heart produced normal sounds, with no murmurs, rubs, or gallops. His blood work came back with results in the normal limits. The EKG showed a normal sinus rhythm, and Physician Assistant ("PA") Schneider testified that the EKG results showed no signs of any kind of prior or current damage to the heart. She further stated the findings of the echocardiogram were also normal. PA Schneider noted that the results did show some valve regurgitation but given that Reynolds has reported no cardiovascular symptoms, she still considered his results normal. At an appointment on April 12, 2021, PA Schneider ordered

additional updated lab tests to be performed by December 2021. It was her opinion that in light of the various diagnostic test results and her physical evaluation, Reynolds did not have a cardiac issue that required testing sooner. Dr. Ahmed likewise stated in his declaration that because Reynolds had "normal lab results within the last year, along with a normal EKG and echocardiogram, the [additional lab tests ordered by PA Schneider] are not considered urgent." (Doc. 74-1, p. 4).

On the record, PA Schneider clarified that the current treatment plan for Reynolds is to maintain good cardiac health through diet and exercise and for him to participate in regular preventative health care visits at chronic care clinic, and if any symptoms manifest or something changes in his health, then he is to report to sick call to schedule an appointment. Although Reynolds would like additional testing or referral to a specialist, Dr. Ahmed is "entitled to deference in treatment decisions," and Reynolds's exhibits from WebMD.com (Doc. 94, p. 40-47) discussing sudden cardiac death do not convince the Court that Dr. Ahmed's conduct has been a departure from accepted professional judgment. *Sain v. Wood*, 512 F.3d 886, 894–95 (7th Cir. 2008). To the contrary, PA Schneider agreed with Dr. Ahmed's determination to wait for the additional labs in December and then follow-up as necessary. Accordingly, Reynolds has not demonstrated that Dr. Ahmed has acted with deliberate indifference regarding treatment of his cardiac condition.

Similarly, there is no evidence the Dr. Ahmed has deviated from acceptable professional standards in treating Reynolds's pulmonary issues. Reynolds was diagnosed and recovered from COVID-19 in October of 2020. It is disputed when Reynolds first began informing medical staff about experiencing a persistent cough and shortness of breath due to lung scarring caused by COVID-19. He claims that he has suffered long term from post-COVID conditions and has reported cough through sick call slips and since recovering from COVID-19 in October 2020. But

the medical records indicate and PA Schneider testified that he did not complain of a cough to her at his December 2, 2020 appointment. (Doc. 74-1, p. 20-21). Even though he did not inform her of a reoccurring cough, at the appointment, PA Schneider preformed a routine pulmonary assessment by listening to Reynolds's lungs with a stethoscope (auscultation) and noted no crackles, rhonchi, or wheezing.

According to Reynolds's exhibits, he submitted a medical request via an electronic message to staff on March 15, 2021. In the message, he complains of hernia pain and COVID-19 symptoms, including a "cough, racking at times," that he has been experiencing since October 2020. (Doc. 2, p. 12). He also complains of not being scheduled for a medical appointment despite repeatedly submitting sick call slips. The medical records show he saw a nurse for his cough on March 26, 2021. (Doc. 74-1, p. 26). The nurse recorded that his oxygen saturation level was 97% and that his lungs sounded clear with good volumes noted. The nurse scheduled Reynolds for a follow-up appointment with PA Schneider. He saw PA Schneider on April 12. (*Id.* at p. 34-36). PA Schneider testified, and the medical records indicate, that he again did not complain of his cough to her at this appointment. She performed a routine evaluation of his lungs and testified that she did not detect any abnormalities, his lungs were clear.

At an appointment on May 11, 2021, with Dr. Ahmed, Reynolds was seen for various medical issues, including complaints of a hacking cough. Dr. Ahmed noted that Reynolds's oxygen saturation level was 97% and that his lungs were clear. (Doc. 74, p. 8). In his declaration, Dr. Ahmed states he discussed with Reynolds "available (but evolving) information regarding post-COVID bronchospasm." (*Id.*). He informed Reynolds on breathing exercises Reynolds could do to improve airflow and prescribed an Albuterol inhaler. PA Schneider testified that the medical community is still learning about how COVID affects patients long term and when patients complain of persistent cough after a COVID infection, Albuterol is an acceptable treatment to try

Page 13 of 19

to relieve some of that cough because it can reduce some of the constriction in the airways. After prescribing the inhaler, if symptoms do not improve or worsen, then further evaluation would be required.

Reynolds testified that Dr. Ahmed diagnosed him as having lung scarring caused by COVID at the May appointment but incorrectly prescribed him asthma medication, which actually does not work because the scarring in his lungs has nothing to do with the opening of the bronchial tubes, for which Albuterol is used. Again, Reynolds has not demonstrated deliberate indifference, but rather that he disagrees with Dr. Ahmed's treatment decision. PA Schneider testified that Reynolds's medical records do not show any sort of abnormality with his pulmonary system and his oxygen saturation levels have been within the normal limits. She stated that if his symptoms do not improve with the Albuterol, then he should let her or nursing staff know and further evaluations will be performed. There is no evidence that Dr. Ahmed's initial treatment decision to treat Reynolds with an inhaler was unreasonable.

Reynolds's disagreement with the diagnosis and treatment of his abdominal pain also does not show a reasonable likelihood of success on the merits of this Eighth Amendment claim. At the March 26 appointment with a nurse, Reynolds complained of abdominal pain at the site of where he previously had hernia repair surgery in 1992. (Doc. 74-1, p. 27). He had a follow-up appointment with PA Schneider for his abdominal pain on April 12. She testified that they discussed his symptoms and based on his described symptoms, including urination issues, she concluded that Reynolds's pain could be caused by benign prostatic hyperplasia ("BPH"), not his repaired hernia. Upon reviewing his labs from December 2020, she confirmed that his PSA levels were normal. She testified that a patient can still have a significant amount of prostate related symptoms while having normal PSA levels. Based on her evaluation, PA Schneider prescribed Flomax, which helps to dilate the urethra and allow the patient to empty the bladder more fully,

releasing pressure and undue stress on the lower abdominal structures. At this appointment, she did not perform a prostate exam. PA Schneider testified that these types of exams are uncomfortable for patients and do not always give definitive explanations for symptoms. She instead opted for medication and observation. (*See* Doc. 74-1, p. 35). PA Schneider stated that an MRI would be contraindicated for Reynolds because there is no need to expose him to the dye when there is not a serious concern of cancer based on his PSA levels. She further testified that an MRI is also not needed to diagnose a hernia. PA Schneider stated that because Reynolds's repair surgery was over 25 years ago and he began experiencing side pain recently in the last year, the likelihood that the pain is cause by failure in the hernia mesh is low. It is her opinions that because Reynolds reported that his pain had somewhat alleviated at his May 11 appointment with Dr. Ahmed, prescribing a higher dose of the Flomax to see if it would provide him further comfort and continuing surveillance of his symptoms is a perfectly acceptable course of treatment.

At the hearing, Reynolds clarified that he seeks further diagnostic testing to confirm the diagnosis of BPH. Without further testing, he continues to take medicine for an issue regarding his prostate that has not been confirmed. Reynolds's "expectation that [Dr. Ahmed] should have changed his course of treatment based on his word alone is not evidence" that the decision to keep him on Flomax is "medically unsound." *Christopher,* 2021 WL 2577132, at *3. Dr. Ahmed's decision to increase the dosage, prior to performing further diagnostic tests "is owed deference because it was an exercise of [his] medical judgment." *Id.* There is no evidence that Dr. Ahmed has acted with deliberate indifference regarding treatment of his abdominal pain.

The Court further notes that to the extent Reynolds is claiming that Dr. Ahmed violated his constitutional rights by delaying treatment, this claim is also not supported by the record, and he has not shown a likelihood of success on the merits. It is disputed whether Reynolds has been submitting sick call slips to be seen by medical staff at FCI-Greenville, according the facility's

procedure. Reynolds claims that he has submitted sick call slips requesting treatment for months beginning in October 2020 that have gone unanswered. Because he was not being scheduled for medical appointments, he began submitting requests and reporting medical issues via electronic messages to Health Services so that he would have a record of his requests. In support of his argument, he has provided copies of handwritten sick call requests and copies of electronic messages he has sent to Health Services reporting various symptoms and asking for medical treatment. (Doc. 2, p. 12; Doc. 95 p. 9-22). At the hearing, Brazzell and PA Schneider testified that the proper way for Reynolds to receive a medical appointment is not by submitting electronic messages, but by going to Health Services and filling out a sick call request form. PA Schneider's testimony also called into question the veracity of the sick call slips that Reynolds's has submitted. She stated there were a few slips that were unusual because they were dated on days when sick call was not conducted — Saturdays and Christmas Eve.

Regardless, there is no evidence that Dr. Ahmed received or read any of these correspondences or was involved in inmate scheduling. Sick call slips went to a nurse at Health Services, or as Reynolds testified, on one occasion he gave his sick call slip to Brazzell. The electronic messages were addressed to Health Services, with the subject line "Request to Staff." In one message, he specifically states he does not want a medical appointment if he will be scheduled with Dr. Ahmed. (Doc. 95, p. 10). Nothing in the record indicates that Dr. Ahmed knowingly delayed treatment, and that Reynolds experienced prolonged suffering due to Dr. Ahmed's conduct. *Christopher v. Liu,* No. 20-2602, 2021 WL 2577132, at *3 (7th Cir. June 23, 2021).

Finally, as to Reynolds's claim that he has been denied dental and eye appointments for over two years, he has also not demonstrated a likelihood of success on the merits. First, these allegations are not in the Complaint or directed at any of the Defendants and not appropriately

Page 16 of 19

before the Court on a motion for preliminary injunction. Furthermore, Reynolds has not established that he suffers from an objectively serious medical need that has been deliberately ignored. He simply requests an eye appointment so that he can obtain new glasses and a routine dental cleaning. The medical records indicate that he had an optometry exam on April 26, 2019, and that a follow-up appointment was not necessary for another 3-5 years. (Doc. 74-1, p. 13). Furthermore, it is not clear what eye condition Reynolds's claims he is suffering from that requires immediate attention. He also has not provided any details regarding his dental needs and the "denial of routine dental care[,]" does not rise to the level of a constitutional violation. *Jones v. Strow*, No. 19-cv-4013-MMM, 2019 WL 5580945, at *3 (C.D. Ill., Oct. 29, 2019) ("there is no established constitutional right to routine dental care, including teeth cleaning" (citing Taylor v. Christian, 42 F.3d 1392 (7th Cir. 1994))).

Reynolds has not demonstrated a likelihood of success on the merits of his Eighth Amendment claim, nor has he shown he will suffer irreparable harm without the emergency relief requested, a final determination on the merits provides an adequate remedy at law. *See Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1045 (7th Cir. 2017) ("harm is considered irreparable if it cannot be prevented or fully rectified by the final judgment after trial.") (internal citations omitted). At the hearing, PA Schneider testified that Reynolds is assigned to her patient list and that she handles most of his evaluations. Reynolds will also see a physician, including Dr. Ahmed, usually annually, for chronic care clinics. She further offered to put him on her schedule for a follow-up visit if he currently is having significant symptoms, without going through the traditional sick call procedures. Reynolds responded to her offer by questioning PA Schneider on the specific treatment and evaluations she would perform at the appointment. He concluded that because she would not commit to certain forms of treatment at the hearing, this proves he is not receiving constitutionally adequate care. This logic is flawed. "The

Page 17 of 19

Eighth Amendment does not give prisoners the right to demand specific medical treatment." *Christopher,* 2021 WL 2577132, at *3 (citing *Arnett v. Webster,* 658 F. 3d 742, 754 (7th Cir. 2011). Reynolds continues to be seen by medical professionals at FCI-Greenville. PA Schneider, with whom Reynolds testified that he does not have any issues, will schedule him an appointment if asked. His current lab, physical exams, and diagnostic testing have produced normal results, there is no indication that he will suffer irreparable harm without Court involvement. Accordingly, the requests for a preliminary injunction regarding inadequate medical care are denied.

## II. Motions for Leave to Proceed *in forma pauperis*

As previously discussed, because Reynolds has had three or more cases dismissed as frivolous, he cannot continue with this case without prepaying the entire filing fee, unless he is in imminent danger. 28 U.S.C. § 1915(g). Imminent danger within the meaning of Section 1915(g) requires a "real and proximate" threat of serious physical injury to a prisoner. *Ciarpaglini v. Saini,* 352 F.3d 328, 330 (7th Cir. 2003) (citing *Lewis v. Sullivan,* 279 F.3d 526, 529 (7th Cir. 2002) ). The imminent danger exception is available "for genuine emergencies," where "time is pressing" and "a threat ... is real and proximate." *Lewis,* 279 F.3d at 531.

Based on the trust fund account statements submitted by Reynolds, he is indigent. However, for the reasons discussed above, the Court finds that there is no threat of serious physical injury, and the IFP motions are denied. *See also Duncan v. Spiller,* No. No. 14-cv-1167-MJR-SCW, 2016 WL 66732, at *3 (S.D. Ill. Jan. 6, 2016) (agreeing that denying a motion for preliminary injunction was "tantamount to a finding that there is no imminent danger of harm" (quoting *Ammons v. Hannula,* No. 08-cv-608-bbc, 2009 WL 799670, at *3 (W.D. Wisc. Mar. 24, 2009))). There are currently no inmates at FCI-Greenville with COVID-19 and if Reynolds is fearful of suffering negative health effects from reinfection, the vaccine is available to him. Additionally, his latest cardiac and pulmonary evaluations and tests have revealed no

abnormalities, and he has been prescribed medication for his cough. He also has received medicine for his abdominal pain. Reynolds testified that his abdominal pain was so intense that he could not sleep at night without pain medication, but he also stated that since taking the Flomax the pain has decreased. Finally, PA Schneider stated she would schedule him for further evaluation on any of his conditions if he would like. Based on the record, there is no evidence that Reynolds is in imminent danger. Thus, the motions for leave to proceed IFP are denied. Reynolds will have 30 days to pay the filing fee of $402.00.

DISPOSITION

For the reasons stated above, the motion for preliminary injunction (Doc. 2), the mandamus motion for medical relief (Doc. 54), and the mandamus motion for medical necessity (Doc. 58) filed by Plaintiff Reynolds are **DENIED**. The motions for leave to proceed *in forma pauperis* (Docs. 37, 55) are also **DENIED**.

Reynolds is **ORDERED** to pay the filing fee of $402.00 on or before **September 29, 2021.** If Reynolds fails to comply with this Order in the time allotted, this action will be dismissed. *See* FED. R. CIV. P. 41(b); *Ladien v. Astrachan*, 128 F.3d 1051, 1056-57 (7th Cir. 1997); *Johnson v. Kamminga*, 34 F.3d 466, 468 (7th Cir. 1994).

The Court **STAYS** all matters in this case until Reynolds has paid the filing fee.

**IT IS SO ORDERED.**

**DATED:   August 30, 2021**

 s/Stephen P. McGlynn
**STEPHEN P. MCGLYNN**
**United States District Judge**